DIRECTOR OF the DEPARTMENT OF
AGRICULTURE AND ENVIRONMENT
et al., Petitioners,

v.

PRINTING INDUSTRIES ASSOCIA-
TION OF TEXAS et al.,
Respondents.

No. B–8991.

Supreme Court of Texas.

June 4, 1980.

DENTON, Justice.

This lawsuit was brought by the Printing Industries Association of Texas and others, (hereinafter referred to as Printers), on behalf of the commercial printers and binders in Texas, to enjoin the Texas Department of Agriculture and Environment and other State agencies from purchasing or using printing equipment. It was alleged that printing performed by State agencies violated Article XVI, Section 21 of the Texas Constitution (hereinafter referred to as Art. XVI, § 21), and art. 4413(32) § 3 Tex.Rev. Civ.Stat.Ann.[1] The Attorney General specially excepted to the pleadings on the grounds that they failed to state a cause of action and did not plead legislative or statutory permission to sue the State. The plaintiffs did not amend their pleadings, and the trial court ordered the suit dismissed. On appeal, the court of civil appeals reversed and remanded, holding that the suit was maintainable against the State agencies for "acting outside their lawful authority, and that invasion of the rights of plaintiffs, was alleged with sufficiency to maintain the suit." 588 S.W.2d 849, 852. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

The court of civil appeals has correctly stated the rule that a suit brought to control State actions or to subject the State to liability is not maintainable without legislative consent or statutory authorization. *Griffin v. Hawn*, 161 Tex. 422, 341 S.W.2d 151 (1960); *Oxford v. Hill*, 558 S.W.2d 557, 560 (Tex.Civ.App.—Austin 1977, writ ref'd); *Bullock v. Hardin*, 578 S.W.2d 550 (Tex.Civ. App.—Austin 1979, writ ref'd n. r. e.); *Sheffield v. Briscoe*, 550 S.W.2d 160 (Tex. Civ.App.—Austin 1977, writ ref'd n. r. e.). It is also a correct statement of the law that an entity or person whose rights have been violated by the unlawful action of a State official, may bring suit to remedy the

Mark White, Atty. Gen., Paul R. Gavia, Asst. Atty. Gen., Austin, for petitioners.

Kammerman, Yeakel & Overstreet, Adrian M. Overstreet, Jr., Austin, for respondents.

1. Tex.Rev.Civ.Stat.Ann. art. 4413(32) § 3 (Vernon 1976), also known as the "Inter-Agency Cooperation Act," requires that:

   [N]o agency shall supply any services, supplies or materials to another agency which are required by Section 21 of Article 16 of the Constitution of Texas to be supplied under contract to the lowest responsible bidder.

violation or prevent its occurrence, and such suit is not a suit against the State requiring legislative or statutory authorization. *Texas Highway Comm'n v. Texas Assoc. of Steel Importers, Inc.*, 372 S.W.2d 525 (Tex. 1963); *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709 (1945); *W. D. Haden Co. v. Dodgen*, 158 Tex. 74, 308 S.W.2d 838 (1958); *State v. Epperson*, 121 Tex. 80, 42 S.W.2d 228 (1931). Therefore the Printers may maintain this suit for injunctive relief only if the printing activities of State agencies are unauthorized.

At issue is the construction of Art. XVI, § 21 of the Texas Constitution. When adopted in 1876, it provided:

> All stationery, and printing, except proclamations and such printing as may be done at the Deaf and Dumb Asylum, paper, and fuel used in the Legislative and other departments of the government, except the Judicial Department, shall be furnished, and the printing and binding of the laws, journals, and department reports, and all other printing and binding and the repairing and furnishing the halls and rooms used for the meetings of the Legislature and its committees, shall be performed under contract, to be given to the lowest responsible bidder, below such maximum price, and under such regulations, as shall be prescribed by law. No member or officer of any department of the government shall be in any way interested in such contracts; and all such contracts shall be subject to the approval of the Governor, Secretary of State and Comptroller.

This section remained unchanged until amended in 1978 for the express purpose of deleting the archaic reference to Deaf and Dumb Asylum, and to encourage State agencies to utilize the products manufactured by handicapped individuals at State rehabilitation facilities. S.J.R. 50, Acts 1977, 65th Leg., p. 3369. Art. XVI, § 21 as amended in 1978 now provides:

> All stationery, printing, fuel used in the legislature and departments of the government other than the judicial department, printing and binding of the laws, journals, and department reports, and all other printing and binding and the repairing and furnishing of the halls and rooms used during meetings of the legislature and in committees, except proclamations and such products and services as may be done by handicapped individuals employed in nonprofit rehabilitation facilities providing sheltered employment to the handicapped in Texas, shall be performed under contract, to be given to the lowest responsible bidder, below such maximum price and under such regulations as shall be prescribed by law. No member or officer of any department of the government shall in any way have a financial interest in such contracts, and all such contracts or programs involving the state use of the products and services of handicapped individuals shall be subject to such requirements as might be established by the legislature.

The State contends that the court of civil appeals erred by failing to consider the historical background of Art. XVI, § 21 in determining the framers' intent. It is argued that the court of civil appeals' narrow, literal interpretation of the provision is contrary to established rules of constitutional construction. The framers' intention, according to the State, was two-fold: 1) to permit printing by State agencies, and in particular to encourage printing instruction at the State rehabilitation center for the hearing impaired; and 2) to ensure that any printing which was not performed by the State would be provided by contract with private printers on a competitive bid basis. It is argued that the constitutional provision was a reaction to the practice of political patronage in the award of lucrative printing contracts during Reconstruction.

The Printers urge that the meaning of Art. XVI, § 21 is quite plain, and that the court of civil appeals did not fail to consider the intention of the framers. The intent of the framers, they urge, was to encourage printing vocational skills among the hearing impaired, rather than authorize State agencies to perform printing. In addition, it is argued, that the framers intended to assure

administrative economy by having all printing, with the exception of printing performed by the handicapped, provided by the private sector via competitive bids.

█ There are several well recognized principles of constitutional law which are applicable. This Court has stated, "The fundamental rule for the government of courts in the interpretation or construction of a Constitution is to give effect to the intent of the people who adopted it." *Cox v. Robison*, 105 Tex. 426, 150 S.W. 1149, 1151 (1912). In determining the intent of the framers, "Constitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments of the people." *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 35 (1931). In *Markowsky v. Newman*, 134 Tex. 440, 136 S.W.2d 808, 813 (1940), this court stated:

> . . . in determining the meaning, intent and purpose of a constitutional provision the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry.

*Id. Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007 (1934).

The court of civil appeals opinion sets out the procedural history of Art. XVI, § 21, but does not consider the historical background of the provision. A consideration of the historical climate which existed at the time this provision was enacted is necessary to an understanding of the framers' intent.

During the 19th century, the printing needs of our State government were considerably less than today. Most printing was performed by local newspapers which were allied with various political interests. In the post-Civil War Reconstruction period, lucrative printing contracts were awarded on the basis of political patronage.[2] At the end of Reconstruction, the position of State Printer was created to perform all the State's printing by an independent contractor.[3] Although "elected" by the Legislature and required to provide a bond, the position of State Printer also went to a political favorite. Additional legislation authorized the appointment of an official State printer in each judicial district as the State Journal. All county and district printing, railroad advertisements, and public notices were required to be printed in the State Journals. Later legislation provided that a State Board on Public Printing could contract for printing with private firms or individuals.[4] This system, of awarding printing contracts and licenses, resulted in exorbitant public printing costs and was widely criticized.[5]

In 1875, prior to the constitutional convention, the Legislature passed "An Act to provide for the Instruction of the Pupils of the Institution for the Deaf and Dumb in the Art of Printing." Tex. Laws, ch. LXXVIII, § 1 at 91, H. Gammel, *Laws of Texas* (1898).[6] This statute authorized the

---

2. Ramsdell, *Reconstruction in Texas* at 205 (1970).

3. 1870 Tex. Gen. Laws, ch. LIV at 70, H. Gammel, *Laws of Texas* 244 (1898). This statute was later extended to provide for more than one public printer. Tex. Laws 1873, ch. V § 1–15, at 4, H. Gammel, *Laws of Texas* (1898).

4. 1874 Tex. Gen. Laws, ch. XXVIII, § 1, at 23, H. Gammel, *Laws of Texas* (1898). In 1919, the authority to arrange State printing and printing contracts was brought under the Board of Control and both the Board of Public Printing and State Printer were abolished. 1919 Tex. Gen. Laws, ch. 84 § 22 at 307 Gammel, *Laws of Texas* (1918–1919).

5. For a general political history of the Reconstruction era *see* Ramsdell, *Reconstruction in Texas* (1970); Nunn, *Texas Under the Carpetbaggers* (1962); McKay, *Seven Decades of the Texas Constitution of 1876* (1942).

6. 1875 Tex. Gen. Laws, ch. LXXVIII, § 1, at 91, H. Gammel, *Laws of Texas* (1898). The act provides in pertinent part:

> Section 1. . . . . That the Board on Public Printing be and is hereby authorized and required to purchase a suitable printing press, with type and all necessary fixtures and material, for the creation of a printing establishment at the said institution for the deaf and dumb, and . . . to employ some competent person for such time or

Board of Public Printing to purchase a printing press, hire an instructor to teach printing, and authorized the Board to have *any* public printing executed by the students at the institution.

■ Article XVI, § 21 was adopted in 1876, and contained a reference to printing which could be performed by the Deaf and Dumb Asylum, the only State-owned printing press, and excepted that institution from the competitive bid requirement. Viewed against this historical background, it is inconceivable that the framers intended to perpetuate the abuses of the previous customs with minor exception of printing performed in the course of vocational instruction for hearing impaired students. On the contrary, this constitutional provision was clearly intended to remedy the past abuses. Interpretative Commentary, Tex. Const. Art. XVI, § 21 (Vernon 1980); *See* Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* (1977). Under Art. XVI, § 21 the general intent of the framers was to require competitive bidding for the State's printing needs which must be performed under contract with private printers. Indeed, the State's authority to satisfy its own printing needs is implicit, and there is no express language prohibiting the State from performing its own printing or from purchasing printing equipment. The only express prohibition contained in this constitutional provision is directed toward State printing contracts which are not awarded by competitive bid. The reference in the provision to the Deaf and Dumb Asylum, reveals a specific intent to encourage the teaching of printing skills in that institution, and to make the institution self-sufficient. Therefore, Art. XVI, § 21 does not prohibit the State from performing its own printing needs.

> times as may be deemed necessary to give *the pupils of said institution* . . . *proper* instruction in the art of printing . . . ..
> Sec. 3. The Public Printing Board of this State, shall have the power to have any public printing executed at said institution at any time that they may see proper and expedient, and when the same can be done by the pupils *of said institution.*

This conclusion is not dictated by the fact that the State has invested large sums of money in printing and word reproduction equipment. In *Koy v. Scheider*, 110 Tex. 369, 218 S.W. 479 (1920), this court stated that the consequences of constitutional interpretation do not control.

> No matter how far-reaching and disastrous would be the consequences . . we would not decline to make the declaration if such was believed to be the true intent of the language of the Constitution. It is a proper inquiry, however, in ascertaining whether a certain interpretation should be given to the language of the Constitution, to consider whether its framers and the voters by whom it was adopted intended the consequences which must follow such interpretation.

*Id.* 218 S.W. at 481. *See Shepherd v. San Jacinto Junior College Dist.*, 363 S.W.2d 742, 752 (Tex.1963).

The framers could not have envisioned the rapid growth of the State's word processing needs, nor the technical advances in the printing industry.[7] Regardless of that fact, they did not intend to frustrate administrative expediency and economy by this provision, but rather, they intended to promote such virtues. At this time, to require the numerous agencies to fulfill their myriad printing needs by contract with private printers would impair the smooth administration of State government. Even the Printers concede that it is less difficult for the State to perform its own printing at the present time, although they dispute that it is more economical to do so. Still it does not require special training to appreciate the fact that if the State were required to abandon its printing activities, the economic loss in terms of surplus equipment would be

7. The framers knew and understood the term "printing" in its broadest *sense, i. e.* a means of word processing or graphic reproduction. Having made this determination, it is unnecessary for this court to decide whether each new and different technical process in the area of word processing or graphic reproduction is within the constitutional restriction.

substantial, and there is no way of knowing, from this record, whether the same functions could in fact be performed more economically by private printers. Therefore, our construction of Art. XVI, § 21 is further supported by the fact that the framers did not intend the consequences which must follow from the interpretation urged by the Printers.

■ Other rules of construction support this interpretation of Art. XVI, § 21. The Texas Constitution is notable for the "particularity of its provisions and the details into which it enters in reference to matters of government." *Brown v. City of Galveston*, 97 Tex. 1, 75 S.W. 488, 493 (1903). Nevertheless, it is often necessary to supply details in some provisions by implication. However, when it is argued that the power of the Legislature is restricted by implication, the parties claiming the restriction have the burden of showing that the implication is required by the constitutional provision in order to give effect to the framers' intent. *Lytle v. Halff*, 75 Tex. 128, 12 S.W. 610, 611 (1889). Here, the Printers argue that a prohibition against printing by the State agencies must necessarily be implied by the language of Art. XVI, § 21. However, they fail to show that such an implication is necessary to carry out the framers' intent, because the framers did not intend to benefit private printers, but instead to promote administrative economy.

■ In addition, general public acceptance of and acquiescence in administrative and legislative interpretations over a long period of time are particularly persuasive and are to be given serious consideration in construing constitutional provisions. *Shepherd v. San Jacinto Junior College Dist.*, 363 S.W.2d 742 (Tex.1963); *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31 (1931); *Brown v. City of Galveston*, 97 Tex. 1, 75 S.W. 488 (1903); *American Indemnity Co. v. City of Austin*, 112 Tex. 239, 246 S.W. 1019 (1922). It is a matter of public record that in the years since Art. XVI, § 21 was adopted, the State has purchased several letterpresses and numerous offset duplicators in addition to other modes of word processing, i. e.

photocopy, multilith. Office of the Auditor, *Agency Graphic Reproduction Study* at 9 (1973). It is significant that the voters of Texas chose to re-adopt this constitutional provision in 1978, with only minor changes, thereby ratifying prior administrative and legislative interpretations.

Another indication of the public acceptance of the legislative and administrative interpretations of Art. XVI, § 21, is the fact that until this suit, these interpretations were not directly challenged by the printing industry. In all this time, only two cases have involved a construction of Art. XVI, § 21, and in neither case was the issue of the State's authorization to perform its own printing decided by a court.

In *State v. Steck Co.*, 236 S.W.2d 866 (Tex.Civ.App.—Austin 1951, writ ref'd) the issue of the State's authority to do printing was not reached. After deciding that the contract in dispute was void for non-compliance with the competitive bid requirement, the court declined to determine whether the stamps provided under the contract had been printed. *Id.* at 868. Although the issue of the State's authorization to perform its own printing was presented in *Teer v. McGann*, 65 S.W.2d 362 (Tex.Civ. App.—Austin 1933, no writ), it was determined that the appeal was moot because the subcontract in issue had been performed under emergency regulations prior to the hearing on appeal. *Id.* at 363–364.

In addition to a reference to *Steck, supra,* the court of civil appeals in this case stated that:

. . . it is appropriate to observe that through the years, in not fewer than a dozen instances, attorneys general of the State have advised agency officials and officers of the Legislature regarding the mandatory provisions of section 21 of Article XVI.

588 S.W.2d at 852.

The Printers refer to Tex.Atty.Gen. Op.No. O–1033 (1939) as some authority for their position. However, this opinion did not reach the issue of whether a State agency could perform its own printing, but

instead concluded that the prison system could not qualify as a responsible bidder under Art. XVI, § 21. This opinion was expressly overruled by Tex.Atty.Gen.Op.No. M–743 (1970). Neither this opinion nor any of the numerous attorney general opinions referred to by the court of civil appeals has expressly held that the State is without authority to purchase printing equipment or perform its own printing under Art. XVI, § 21.

■ We hold that the intent of the framers in enacting Art. XVI, § 21 of the Texas Constitution was to benefit and protect the citizens of the State, not to benefit private printers. The purpose of the provision was to guard against favoritism, corruption and extravagance in State government, to encourage administrative economy, and to secure the advantages of competitive bidding by private printers for those printing needs which were beyond the State's own capabilities or when private printing was deemed desirable. Therefore, the State officials have not acted outside their lawful authority under Art. XVI, § 21 or Tex.Rev.Civ. Stat.Ann. art. 4413(32) (Vernon 1976), and in the absence of legislative consent, we hold that the suit is not maintainable.

Accordingly, the judgment of the court of civil appeals is reversed and the judgment of the trial court is affirmed.

POPE, J., dissenting.

GARWOOD, J., concurring joined by GREENHILL, C. J.

POPE, Justice, dissenting.

The majority opinion has given us a new canon for the construction of constitutions. Without a vote of the people, long standing disregard for clear words of a constitution can override and amend it. The whole record before us consists of a petition naming some thirty-five agencies that plaintiffs allege are violating the constitutional prohibition found in Article XVI, Section 21, of the Texas Constitution. The court has upheld the trial court's ruling on special exceptions and its dismissal of plaintiff's suit.

The court's interesting discussion about the meaning of words used by our constitution makers in 1876 does not come from these plain, clear and unambiguous words of the Constitution itself:

All stationery, and printing . . . shall be furnished, and the printing and binding of the laws, journals, and department reports, and all other printing and binding . . . shall be performed under contract, to be given to the lowest responsible bidder . . . .

I do not know, and the majority does not tell us, which one of the words under construction is ambiguous. It has to be either "All," "printing," "performed under contract" or "lowest responsible bidder." We get the intent of the constitution makers from the words they used. They chose words that do not require resort even to the dictionary. They used sentence structure that is simple and easily diagramed. What is there to construe? By the use of recent history books aliunde the record, we are now told that the words by long standing practice mean:

All printing may be performed without a contract and without a responsible bidder.

The authors of the Constitution knew how to make and state exceptions to their mandate, and they did that. They declared that it was their intent that the prohibition would not apply to what was then called the Deaf and Dumb Asylum. The thirty-five defendants named in this action were not excepted. The circuity of the court's reasoning appears from its rationale that a result contrary to today's decision would mean that the State would have an abundance of surplus printing equipment, a thing which the authors of the 1876 document did not intend.

Long standing violation of the Constitution by the legislature itself cannot change the Constitution, as this court has previously held by its refusal of the writ in *Terrell v. Middleton*, 187 S.W. 367, 373–74 (Tex.Civ. App.1916), wherein the court wrote:

A wrong cannot be sanctioned by age and acquiescence, and transformed into a virtue. . . .

*    *    *    *    *    *

The will of a sovereign people as expressed through their organic law is supreme, and necessity, legislative construction, and legislative act cannot weaken, impair or destroy it.

Justice Cardozo once wrote, "We are not at liberty to revise while professing to construe." *Sun Printing & Publishing Ass'n v. Remington Paper & Power Co., Inc.*, 235 N.Y. 338, 346, 139 N.E. 470, 471 (1923). However desirable a result may be, we do more harm than good to the fabric of the law when we convolute simple words and a simple standard to mean, "It's all right, because everybody's doing it."

I would affirm the judgment of the court of civil appeals.

GARWOOD, Justice, concurring.

I concur because in my opinion when Article XVI, Section 21 was readopted with amendments in 1978, it was not intended to thereby prohibit the State from continuing its known and unchallenged practice, then of many decades duration, of doing much of its own printing.

GREENHILL, C. J., joins in this concurring opinion.